**FILED & ENTERED**

AUG 10 2023

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY Pgarcia    DEPUTY CLERK**

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>RALPH A. LLITERAS and TINA M. LLITERAS,<br><br>     Debtors.<br><hr>CHARLES KINE dba AQUA WORLD UNLIMITED, CORP,<br><br>     Plaintiff,<br><br>   vs.<br><br>RALPH A. LLITERAS,<br><br>     Defendant. | Case No.: 1:22-bk-10040-VK<br><br>Chapter 7<br><br>Adv. No.: 1:22-ap-01018-VK<br><br>**MEMORANDUM OF DECISION AFTER TRIAL** |

On May 24 and 25, 2023, the Court conducted a trial in the above-captioned adversary proceeding. Christine A. Kingston appeared on behalf of plaintiff Charles Kine dba Aqua World Unlimited Corp. Defendant Ralph A. Lliteras appeared on his own behalf.

The Court has jurisdiction over the adversary proceeding commenced by the filing of Mr.

Kine's *Amended Complaint for: Determination that Debt is Nondischargeable Pursuant to 11*

*U.S.C. § 523(a)(2); and § 523(a)(4)* [doc. 5]. The matter in controversy is a core proceeding.

Venue is proper pursuant to 28 U.S.C. § 1409.

For the following reasons, the Court will enter judgment for Mr. Lliteras. This

Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.

## I.    STATEMENT OF FACTS

On January 12, 2022, Ralph A. Lliteras ("Defendant") and Tina M. Lliteras filed a

chapter 7 petition (the "Petition"), initiating case no.1:22-bk-10040-VK [bankruptcy case docket,

doc. 1].[1]

On April 18, 2022, Charles Kine dba Aqua World Unlimited Corp ("Plaintiff") filed a

complaint against Defendant, initiating adversary proceeding no. 1:22-ap-01018-VK [doc. 1]. On

April 19, 2022, Plaintiff filed an amended complaint (the "Complaint") [doc. 5]. In the

Complaint, Plaintiff requested that the Court issue a judgment declaring that the debt owed to

him by Defendant was not dischargeable pursuant to 11 U.S.C. § 523(a)(2) and (a)(4). In their

amended joint pretrial stipulation (the "Joint Pretrial Stipulation") [doc. 40], the parties stated

that the only issues of law that remained to be litigated with respect to Plaintiff's claim under 11

U.S.C. § 523(a)(4) were whether Defendant committed embezzlement or larceny.

## A.    The Parties' Relationship and Central City Studio 1, LLC

The parties first met in 2015, and from 2016 through 2019, the parties developed a

relationship through being together at social occasions. Joint Pretrial Stipulation, pp. 1-2. In

---

[1] If no other citation is given, the facts set forth are from the trial testimony.

2016, Plaintiff loaned Defendant $10,000 by executing a promissory note and a Security/Lien Agreement, which was fully repaid. *Id.*, p. 1.

When the parties met, Defendant was operating a successful entity, called Central City Stages, which provided access to a film production facility located in downtown Los Angeles. Central City Stages was known as one of the top three standing sets of its kind in southern California. *Id.*, p. 3. Around December 2015, and after Defendant became aware that the building which housed the film production facility was condemned, Central City Stages went out of business, and a number of its props and set pieces, including a hospital morgue, were placed into storage.

In 2019, Defendant was seeking capital to start operating a new film production facility, called Central City Studio 1, LLC ("Central LLC"). Pursuant to Central LLC's Certification of Members, initially, Defendant and his spouse and co-debtor Tina Lliteras each held a 40% interest in Central LLC,[2] and Catherine Bentancur and Dominique Aguilar each held a 10% interest. Plaintiff's Exh. 15.[3]

On May 20, 2019, Defendant and Mrs. Lliteras deposited a capital contribution of $22,000 into Central LLC's bank account. Plaintiff's Exh. 13. On July 11, 2019, Ms. Aguilar deposited $43,500 into Central LLC's bank account, and between July 8, 2019 and August 27, 2019, Ms. Bentancur contributed funds totaling $38,000 to Central LLC. Plaintiff's Exh. 13. At trial, Defendant testified that Ms. Aguilar and Ms. Bentancur obtained the funds for their contributions from various lines of credit.

---

[2] At all relevant times, Defendant held at least a 30% interest in Central LLC. *See* Plaintiff's Exhs. 10 and 15.

[3] Reference to any exhibits constitutes a reference to exhibits submitted at trial by either Plaintiff or Defendant and admitted at trial.

On June 27, 2019, Defendant, on behalf and as managing member of Central LLC, signed a lease for commercial real estate located at 8411 Canoga Ave, Canoga Park CA (the "Property") out of which Central LLC would provide a film production facility. Declaration of Ralph A. Lliteras ("Lliteras Declaration"), ¶ 6 [doc. 59] and Defendant's Exh. H. The Property consisted of approximately 21,480 square feet of light industrial warehouse space. Defendant's Exh. H. In addition, the Property contained a lobby, offices, dressing rooms, a kitchenette and restrooms. *Id*. The 3-year and 1 month lease began on July 15, 2019, with monthly rent payments of $28,568.40. *Id*. In July 2019, when Central LLC took possession of the Property, there were no sets or stages in the warehouse; they had to be constructed. For filming in the Property, Central LLC charged clients for access to the Property and its resources, i.e., the sets and props, on a sliding scale, ranging from $500 per day for student films to $5,000 per day for larger projects.

On July 17, 2019, Central LLC paid its first and last month's rent for the Property, totaling $57,136.80. Plaintiff's Exh. 13. On August 22, 2019, Central LLC paid $18,568.40 for its August 2019 rent, which was short by $10,000. *Id*. On October 3, 2019, Central LLC paid $28,568.40 for the September 2019 rent. *Id*. No further rent payments were made.

After obtaining access to the Property in July 2019, Central LLC began building out film stages. Central LLC used day laborers for the build-out, and Defendant, as Central LLC's managing member, paid them $100 in cash for each day of work. Defendant anticipated that, until the film stages were completed, student films would be made in the Property.[4]

Around the end of June 2019, after Defendant signed the lease for the Property on behalf of Central LLC, Defendant told Plaintiff that he had raised a little over $100,000. Defendant further advised Plaintiff that he intended to alter the back of the Property to make it look like the

---

[4] During the build-out, some student projects did film in the Property.

outside of a police precinct. According to Defendant, Plaintiff asked how much such a project

would cost, and Defendant responded between $30,000 and $50,000. Defendant asked Plaintiff if

he was interested in investing in Central LLC and told Plaintiff that Defendant would sell 10% of

his interest for $50,000.

Plaintiff asserts that Defendant told him that any money Plaintiff invested would be used

to finish the hospital and jail sets. Declaration of Charles Kine (the "Kine Declaration"), ¶ 7

[doc. 56]. Plaintiff also stated that Defendant told him he needed approximately $50,000 "to

complete the studio." *Id.*, ¶ 8.  Plaintiff represents that he "relied on [Defendant's]

statements…in my decision to lend him $50,000 to finish [the] studio so he could take [] work

and make money." *Id.*, ¶ 13.

When Central LLC took possession of the Property, the air conditioning in the Property's

warehouse area did not function properly; however, there was sufficient air conditioning in the

Property's lobby, offices and the kitchenette. The lack of functioning air conditioning in the

Property's warehouse slowed down construction of Central LLC's sets and stages, which

Defendant did not anticipate when Central LLC took possession of the Property. Defendant

anticipated that the warehouse's lack of functional air conditioning would be completely

resolved by October 2019. In addition, Defendant contemplated that Central LLC could purchase

air conditioning units for the Property and ask the landlord to reduce Central LLC's rent, as an

offset for that cost, which was incurred as a result of the warehouse area's broken air

conditioning. To manage until the lessor corrected the air conditioning problem, Central LLC

began renting air conditioning units; in addition, during filming, production companies could

bring in their own units.

**B.      Plaintiff's Initial Visit to Central LLC**

Plaintiff is legally blind. Joint Pretrial Stipulation, p. 1. On September 10, 2019, Plaintiff

and his associate John McKracken visited the Property. Declaration of Tina Marguerite Lliteras,

("Marguerite Declaration") ¶ 7 [doc. 60].[5] During this visit, Plaintiff told Defendant that Mr.

McKracken would be "his eyes."  While Mr. McKracken went into the warehouse, where stages

were being built, Plaintiff stayed in the Property's lobby. While Mr. McKracken was in the

warehouse, Defendant told Plaintiff that Central LLC was getting "a lot of buzz."

During the September 10, 2019 visit, and with respect to how Plaintiff would be paid on

his investment in Central LLC, Defendant advised that he wanted to hold a full year of profits in

the bank. According to Plaintiff, during the September 10, 2019 visit, Defendant told him that

Central LLC had 10 bookings and that Central LLC was worth approximately $500,000. *See*

Kine Declaration, ¶ 9.[6]  Defendant denies that he provided a valuation of Central LLC to

Plaintiff.

Central LLC began getting bookings in September 2019.  Regarding what constituted a

"booking," in accordance with Central LLC's regular business practices, a booking occurred

when people would call Central LLC and reserve a spot on its calendar to film. Central LLC

typically did not receive a deposit or prepayment for the booking at the time it was made; rather,

Central LLC was paid when the person or entity with the booking came into Central LLC and

filmed.

---

[5] Plaintiff contends that the visit occurred in July 2019. The Court finds that the testimony of Defendant and his
spouse that Plaintiff's visit of the Property took place in September 2019 is more credible.

[6] At trial, there was discussion of a personal financial statement provided by Defendant to the Property's lessor,
which financial statement was not admitted into evidence. In any event, the existence and provision of such a
financial statement does not signify that Defendant gave **Plaintiff** any valuation of Central LLC's assets. Plaintiff
did not testify that Plaintiff was provided with, or relied upon, this financial statement, before providing the Funds to
Defendant.

## C.      The Share Purchase Agreements

On September 3, 2019, Plaintiff sent Defendant an email asking him to send a contract to Aqua World Unlimited Inc, 1201 Puerta Del Sol, Ste 235, San Clemente, CA 92673. Plaintiff's Exh. 8. The same day, Defendant sent Plaintiff a share purchase agreement via email with the message "[l]et me know if there are any changes needed." Joint Pretrial Stipulation, p. 2. Plaintiff testified that, because he is blind, he does not read or write his emails, and he cannot view photographs sent to him via email. Plaintiff also testified that third parties, including his business partner Darren Kenney, read Plaintiff's emails and reads other documents that Plaintiff receives via email out loud to Plaintiff.

On September 17, 2019, the parties met at a branch office of Wells Fargo Bank to execute a share purchase agreement. According to Defendant, both he and Plaintiff each brought a copy of the share purchase agreement. Before Defendant went to the bank, he executed his version of the share purchase agreement, which Mrs. Lliteras signed as a witness. Defendant's Exh. A. At trial, Defendant testified that, while they were at the bank, he read his version of the share purchase agreement out loud to Plaintiff. In addition, Defendant testified that, although he did not read it, he signed the share purchase agreement that Plaintiff brought to the bank.

The share purchase agreement that Defendant sent to Plaintiff on September 3, 2019 and brought to the bank on September 17, 2019 stated, in pertinent part:

THIS SHARE PURCHASE AGREEMENT (the "Agreement") made and entered into this 4th day of September, 2019 (the "Execution Date").

BETWEEN: Ralph Lliteras/[Central LLC]…(the "Seller")…and Aqua World Unlimited Corp…(the "Purchaser")…

BACKGROUND:

A. The Seller is the owner of record of 10 A Shares (the "Shares") of [Central LLC] (the "Corporation").

B.  The Seller desires to sell the Shares to the Purchaser and the Purchaser desires to purchase the Shares from the Seller.

…

2. The Seller agrees to sell and the Purchaser agrees to purchase all the rights, title, interest, and property of the Seller in the Shares for an aggregate purchase price of $50,000 (the "Purchase Price").

3. A deposit of $20,000 will be payable by September 4, 2019. The balance of $30,000 will be payable on closing of this Agreement.

…

7. The closing of the purchase and sale of the Shares (the "Closing") will take place September 18, 2019 (the "Closing date") at the offices of the Seller or at such other time and place as the Seller and the Purchaser mutually agree. At Closing and upon the Purchaser paying the balance of the Purchase Price in full to the Seller, the Seller will deliver to the Purchaser duly executed transfers of the Shares.

…

11…. [A]ny dividends earned by the Shares and payable after the Closing of this Agreement will belong to the Purchaser.

…

14. $20,000 paid up front with an additional $30,000 within two weeks for a total of $50,000 towards the purchase of ten percent (10%) of [Central LLC].

Defendant's Exh. A. According to Plaintiff, the share purchase agreement that he and Defendant executed at Wells Fargo stated, in pertinent part:

3. A deposit of $20,000 will be payable by *September 17, 2019*. The balance of $30,000 will be payable on closing of this Agreement.

…

7. The closing of the purchase and sale of the Shares (the "Closing") will take place on *October 2, 2019* (the "Closing Date") at the offices of the Seller or at such other time and place as the Seller and the Purchaser mutually agree.

…

14. $20,000 paid up front with an additional $30,000 within two weeks for a total of $50,000 towards the purchase of ten percent (10%) of [Central LLC]. *Profits with a base of $2,500.00 to begin payments starting 11/15/19 Deposited as instructed by Aqua World Unlimited Corp. By direct deposit or cashier's check.*

Plaintiff's Exh. 11 (emphasis representing changes or additions to Defendant's version of the share purchase agreement added). With respect to paragraph 14 of Plaintiff's version of the share purchase agreement, "11/15/19" is in handwriting, and the rest of the agreement is typed. The handwritten portion is not initialed by either of the parties.[7] Plaintiff's version of the share

---

[7] Defendant credibly testified that it is his standard practice to initial any handwritten changes to documents, such as the share purchase agreement.

-8-

purchase agreement was executed by both Plaintiff and Defendant and witnessed by third party

Linh Nguyen. Defendant contends that the parties did not have any discussion about the

commencement or provision of regular profit payments during their meeting at the bank and that

Plaintiff altered the fully executed share purchase agreement after Defendant signed it.

On September 17, 2019, Defendant deposited a cashier's check from Plaintiff, in the

amount of $20,000, into Central LLC's corporate bank account. Plaintiff's Exhs. 12 and 13.

On September 25, 2019, Defendant sent Plaintiff an email containing a copy of Central

LLC's floorplan and stated:

> This is a rough floorplan on what is being built. Also note that this floorplan has
> already built 5 star rooms, 2 hair and makeup rooms, 2 Wardrobe rooms,
> background holding rooms and a production office. Two large restrooms, 2 all
> gender/handicapped restrooms and a kitchenette. A dining hall that will sit 100
> people.

Plaintiff's Exh. 25. The same day, Defendant sent Plaintiff an email with 12 photographs

showing what appears to be the status of several film stages that were being built, and stated:

> Pictures 1, 2
> Entrance to the lobby of the Police/detective precinct. Double glass doors leading
> to a lobby with a two elevator set.
> Pictures 3,4,5 are the detective bull pen also showing the captains office to the left
> and a conference room to the right.
> Pictures 6, 7 are inside the 3 set jail room
> Pictures 8,9,10,11,12 are the hallway leading to the interrogation rooms and the
> suspect line up.
> Pictures 13-17 ate the morgue and yes this is a real morgue which I bought and
> pulled from Martin Luther King Hospital.
> The last pictures are where the emergency hospital will stand.
> We also have access to another vacant building on the same lot that is 6k sq ft.

Plaintiff's Exh. 26.

On October 1, 2019, Defendant deposited another cashier's check from Plaintiff, in the

amount of $30,000 (together with the $20,000 deposit provided on September 17, 2019, the

"Funds"), into Central LLC's corporate bank account. Plaintiff's Exhs. 12 and 13. Defendant

testified that part of the Funds were used to complete Central LLC's build-out and that $20,000

of the Funds were used to pay part of Central LLC's rent.

Plaintiff testified that he understood the agreement between the parties to provide that

Plaintiff would receive payments after he "loaned" Defendant money. [8] In her declaration, Mrs.

Lliteras stated that:

> [I]t was never agreed that ten percent of [Central LLC] would be a partnership
> interest and a loan. It was one or the other and if it was to be only a loan then we
> would pass as this was a startup company and the last thing, [sic] we needed at the
> time was a loan we had to pay back.

Marguerite Declaration, ¶ 9. At trial, Defendant testified that he told Plaintiff he was not

interested in a loan. After the share purchase agreement was signed, Plaintiff did not receive any

payments in connection with the share purchase agreement.

**D.    Central LLC's Operating Agreement**

As relates to the transfer of a member's interest in Central LLC, Central LLC's operating

agreement provides, in relevant part:

> 7.1 ASSIGNMENT. If a Member proposes to sell, assign, or otherwise dispose of
> all or part of his or her interest in the Company, that Member must comply with the
> following procedures:
>
> (a) The Member must first make a written offer to the other Member(s) which
> includes the price. At this point the exiting Member may not make this intention
> publicly known. The existing Member my not make the intention to sell publicly
> known unless the other Members declined or failed to elect such interest within
> sixty (60) days of the offer. After 60 days have passed, the exiting Member may
> advertise the sale of his or her membership interest as the Member desires.

---

[8] Other than the disputed provision regarding payments to start in November 2019 (the frequency of which
payments is not even set forth in Plaintiff's version of the share purchase agreement), it does not appear that the
Funds were a loan or that the parties reached an agreement to treat Plaintiff's provision of the Funds as a loan. For
example, there is no interest rate or maturity date in either version of the share purchase agreements that were
entered into evidence. *See* Plaintiff's Exh. 11; Defendant's Exh. A. Moreover, the documents themselves are titled
"Share Purchase Agreement," not "Loan Agreement." *Id*.  In exchange for the Funds, the share purchase agreement
provides Plaintiff with a 10% interest in Central LLC, by transferring a portion of Defendant's interest in Central
LLC to Plaintiff. In addition, when Plaintiff made a loan to Defendant in June 2016, Defendant executed a
promissory note and a Security/Lien Agreement.  Kine Declaration, ¶ 5.  In contrast, when Plaintiff provided the
Funds, Defendant did not provide such documents to Plaintiff.  Consequently, Plaintiff's contention that he "loaned"
the Funds to Defendant is not credible.

(b) If a Member has a potential buyer of the member's interest, the other current Member(s) have first option to purchase the exiting Member's interest at the agreed purchase price. If there are more than one current remaining Members, those remaining Members may combine funds to purchase the exiting Member's interest. Current Members have 60 days to buy the exiting Members' interest if they so desire. The exiting Member must show that any potential purchaser has full certified funds, or the ability to get full certified funds before the 60 day first right of refusal period starts.

(c) Current Members must unanimously approve the sale of an exiting Member's interest to grant full membership benefits and functionality to the new Member. If the current remaining Members do not unanimously approve the sale, the purchaser or assignee will have no right to participate in the management and affairs of the business or to exercise Member voting rights. The purchaser or assignee is only entitled to the share of the profits or other compensation and the return of contributions to which that Member would otherwise be entitled. The exiting Member must disclose to the potential buyer or assignee if current Members will not approve the sale.

Plaintiff's Exh. 15. Defendant testified that he had unanimous consent of all Central LLC's members when he sold a portion of Defendant's interest in Central LLC to Plaintiff and that there was no formal vote or meeting between Central LLC's members regarding the sale.

**E.      Events Following Plaintiff's Transfer of the Funds to Defendant, in Exchange for a 10% Interest in Central LLC**

On December 7, 2019, Plaintiff and Mr. Kenney, Plaintiff's business partner, attended a launch party at Central LLC. Kine Declaration, ¶ 23. Mr. Kenney viewed Central LLC's actual physical studio and described it to Plaintiff as "wow." *Id.*[9] By that time, Central LLC was listed on websites for filming location scouts. Defendant testified that he believed bigger film projects were coming, and he was not worried about Central LLC's operations.

In late 2019, projects that were booked with Central LLC to use the Property began getting cancelled, reportedly because of directors and producers becoming very ill. Mrs. Lliteras testified that from the last week of December 2019 until March 19, 2020, all of the projects that

---

[9] On January 15, 2020, Defendant sent Plaintiff emails with photographs of what appeared to be, among others, completed hospital, exam room and morgue sets attached. Plaintiff's Exh. 23.

had been booked at Central LLC were cancelled, reportedly as a result of illnesses. Central LLC

did not receive payment for cancelled bookings; in accordance with its business practices,

Central LLC typically was not paid for the use of the Property or its props until the booking party

showed up and started filming.

On March 19, 2020, California Governor Gavin Newsom issued Executive Order N-33-

20 as a result of the COVID-19 pandemic (the "Health Order"). *See* Office of Governor Gavin

Newsom, *Governor Gavin Newsom Issues Stay at Home Order*, Executive Department State of

California, https://www.gov.ca.gov/2020/03/19/governor-gavin-newsom-issues-stay-at-home-

order/ (last visited August 9, 2023); *Executive Order N-33-20*, Executive Department State of

California, https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-EO-N-33-20-COVID-

19-HEALTH-ORDER-03.19.2020-signed.pdf (last visited August 9, 2023).

Pursuant to the Health Order, all individuals living in the State of California were ordered

to stay home or at their place of residence except as needed to maintain continuity of operations

of certain federal critical infrastructure sectors. *Id*. Consequently, Central LLC shut down.

According to Ms. Lliteras, who handled Central LLC's bookings, there were projects booked on

Central LLC's calendar and, if not for the Health Order, Central City LLC's facilities at the

Property would have been heavily used. Defendant credibly testified that the COVID-19

pandemic affected Central LLC's business because every major actor was staying home, the only

actors who were filming at that time were "B, C and D-listers" and that many "A-list" actors did

not start filming again until 2022.

On August 7, 2021, Central LLC vacated the Property. According to Defendant, when

Central LLC was evicted, it "unfortunately [] waited till the last minute simply because we hoped

that the city and the film commission, who [Defendant] was in talks with, would find a way to

bail [Central LLC] out. It didn't happen and we left…." Plaintiff's Exh. 15. All of the sets were destroyed and disposed of. Joint Pretrial Stipulation, p. 3; Plaintiff's Exh. 15. All of the furniture that dressed the sets was abandoned and left behind at the Property. Joint Pretrial Stipulation, pp. 3-4; Plaintiff's Exh. 15.

On December 14, 2021, Central LLC filed a termination Certificate of Dissolution with the California Secretary of State. *Id*., p. 2. In his declaration, Defendant stated that Central LLC filed the Certificate of Dissolution because it "could not pay LLC Taxes [sic] and we knew that the stages were not going to survive the Covid pandemic." Lliteras Declaration, ¶ 35. Defendant further stated that "[t]he only reason the stages are closed is due to Covid." *Id*., ¶ 39. Mrs. Lliteras also testified that Central LLC ceased operating because of the COVID-19 pandemic. *See also* Marguerite Declaration, ¶ 11 ("We lost the stages because of Covid and for no other reason").

**F.    Defendant's Bankruptcy Case and the Adversary Proceeding**

On January 12, 2022, Defendant and Mrs. Lliteras (together, "Debtors") filed the Petition. In their Amended Schedule E/F, Debtors disclosed a disputed unsecured nonpriority claim of Plaintiff in the amount of $15,000 [bankruptcy case docket, doc. 15, p. 2]. Debtors described Plaintiff's debt as "[i]nvestor in business." *Id.*

On April 18, 2022, Plaintiff initiated this adversary proceeding. As to his claim under 11 U.S.C. § 523(a)(2), Plaintiff asserts that Defendant knowingly and fraudulently made misrepresentations or omissions in connection with Central LLC to induce Plaintiff to transfer the Funds to Defendant. With respect to his claim under 11 U.S.C. § 523(a)(4), Plaintiff asserts

that Defendant either embezzled, or, in the alternative, committed larceny in connection with the Funds.[10]

## II.    LEGAL STANDARDS

### A.    Burden of Proof in Nondischargeability Cases

The plaintiff's burden of proof in a nondischargeability action under 11 U.S.C. § 523(a) is "the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).  "Proof by the preponderance of the evidence means that it is sufficient to persuade the finder of fact that the proposition is more likely true than not." *In re Arnold & Baker Farms*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996) (citing to *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970)).

### B.    11 U.S.C. § 523(a)(2)(A)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a bankruptcy discharge does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's or an insider's financial condition." Section 523(a)(2)(A) specifically excludes "a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A); *see also In re Howell*, 623 B.R. 565, 576 (Bankr. C.D. Cal. 2020). Representations concerning the value of a debtor's company are representations about the debtor's and an insider's financial condition. *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1761, 201 L.Ed.2d 102, 86 USLW 4362 (2018) ("We…agree that a statement is

---

[10] In the Trial Brief, in connection with Defendant's role as managing member of Central LLC, Plaintiff appears to assert claims under 11 U.S.C. § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity. *See* Trial Brief, pp. 6-7. Because the Joint Pretrial Stipulation does not include this as an issue of law to be decided at trial, the Court will not address such claims.

'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status….Naturally, then, a statement about a single asset can be a 'statement respecting the debtor's financial condition.'") (citations omitted). A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or conduct intended to create and foster a false impression. *In re Reingold*, 2013 Bankr. LEXIS 1660, *8-10 n. 4 (B.A.P. 9th Cir. Mar. 19, 2013).

To prevail on a section 523(a)(2)(A) claim, plaintiffs must prove by a preponderance of the evidence the following five elements:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;
> (2) knowledge of the falsity or deceptiveness of his statement or conduct;
> (3) an intent to deceive;
> (4) justifiable reliance by the creditor on the debtor's statement or conduct; and
> (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*In re Weinberg*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) (citing *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000)).

A stated purpose of a loan can be a representation for the purposes of section 523(a)(2)(A). *See Reingold*, 2013 Bankr. LEXIS 1660, at *19-21 (citing *United States v. Gibson*, 690 F.2d 697, 701 (9th Cir. 1982)).

**1.      Representations with Knowledge of Falsity and Intent to Deceive**

Representations made without an intent to perform satisfy the first three requirements of section 523(a)(2)(A). *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989). A promise also can be considered fraudulent when the promisor knew or should have known of his inability to perform. *In re Barrack*, 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998). "When the misrepresentation is a promise to perform in the future, the subsequent failure to perform is not enough to prove the promise was fraudulent; rather it must be shown that the debtor did not intend to perform at the

time the promise was made." *See In re Roberts*, 538 B.R. 1, 10 (Bankr. C.D. Cal. 2015) (citing *In re Lee,* 186 B.R. 695, 699 (B.A.P. 9th Cir. 1995)).

"[B]ankruptcy courts have conceded that a debtor's silence or omission regarding a material fact can constitute a false representation which is actionable under § 523(a)(2)(A)." *In re Eashai*, 87 F.3d 1082, 1089 (9th Cir. 1996) (citations omitted). "An omission gives rise to liability for fraud only when there is a duty to disclose." *Id*. The Restatement (Second) of Torts § 551 provides:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
>
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> …
>> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*In re Apte*, 96 F.3d 1319, 1324 (9th Cir. 1996). "[A] party to a business transaction has a duty to disclose when the other party is ignorant of material facts which he does not have an opportunity to discover." *Id*. "Immaterial facts cannot serve as the predicate for a finding of fraud….But a material fact is simply one that a reasonable investor might have considered... important in the making of [an] investment decision." *In re Werner*, 817 Fed. Appx. 432, 436 (9th Cir. 2020) (citation omitted).

Because intent is difficult to prove through direct evidence, it "may be established by circumstantial evidence, or by inferences drawn from a course of conduct. Therefore, in

determining whether the debtor had no intention to perform, a court may look to all the

surrounding facts and circumstances." *Barrack*, 217 B.R. at 607 (quotations omitted). A court

may infer intent to deceive from a false representation. *Rubin*, 875 F.2d at 759; *see also Eashai*,

87 F.3d at 1087 ("a court may infer the existence of the debtor's intent not to pay if the facts and

circumstances of a particular case present a picture of deceptive conduct by the debtor"); *In re

Gertsch*, 237 B.R. 160, 167-68 (B.A.P. 9th Cir. 1999) ("intent to deceive can be inferred from

the totality of the circumstances, including reckless disregard for the truth").

### 2.      Justifiable Reliance

To satisfy the reliance requirement of section 523(a)(2)(A), a plaintiff must show

"justifiable" reliance, not "reasonable reliance." *Field v. Mans*, 516 U.S. 59, 74-75, 116 S. Ct.

437, 445-46, 133 L. Ed. 2d 351 (1995). Justifiable reliance takes into account the "qualities and

characteristics of the particular plaintiff, and the circumstances of the particular case, rather than

of the application of a community standard of conduct to all cases." *Id*. at 71. Thus, a plaintiff

does not have a duty to investigate. *Id*. at 70, 75 n.12. However, "justifiable reliance does not

exist where a creditor ignores red flags" that show up before extending credit. *In re Miller*, 310

B.R. 185, 198-99 (Bankr. C.D. Cal. 2004) (citing *In re Anastas*, 94 F.3d 1280, 1286 (9th Cir.

1996)); *see also In re Apte*, 180 B.R. 223, 229 (B.A.P. 9th Cir. 1995), *aff'd*, 96 F.3d 1319, 1324

(9th Cir. 1996).

### C.      11 U.S.C. § 523(a)(2)(B)

Pursuant to 11 U.S.C. § 523(a)(2)(B), the plaintiff must show that the debtor incurred a

debt by "use of a statement in writing:"

> (i)      that is materially false;
> (ii)     respecting the debtor's or an insider's financial condition;
> (iii)    on which the creditor to whom the debtor is liable for such money,
> property, services, or credit reasonably relied; and

(iv)    that the debtor caused to be made or published with intent to deceive[.]

The elements of a claim under section 523(a)(2)(B) are: (1) a representation of fact by the debtor; (2) that was material; (3) that the debtor knew at the time to be false; (4) that the debtor made with the intention of deceiving the creditor; (5) upon which the creditor relief; (6) that the creditor's reliance was reasonable; (7) that damage proximately resulted from the representation. *In re Candland*, 90 F.3d 1466, 1469 (9th Cir. 1996).

A statement is materially false if it paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *In re Greene*, 96 B.R. 279, 283 (9th Cir. 1989). Additionally, "'material falsity' in a financial statement can be premised upon the inclusion of false information or upon the omission of information about a debtor's financial condition." *Id*. (citations omitted).

Statements regarding financial conditions are actionable and are required to be in writing under section 523(a)(2)(B). *In re Howell*, 623 B.R. at 576-77 ("It is correct that statements regarding financial condition must be brought under § 523(a)(2)(B)"). Under section 523(a)(2)(B), a statement "must either have been written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor." *In re Tallant*, 218 B.R. 58, 69 (B.A.P. 9th Cir. 1998) (citation omitted). Financial condition concerns a debtor's "overall financial status." *See Lamar, Archer & Cofrin, LLP*, 138 S.Ct. at 1761.

**D.    11 U.S.C. § 523(a)(4)**

Pursuant to 11 U.S.C. § 523(a)(4), a bankruptcy discharge does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

### 1.    Embezzlement

"Federal law and not state law controls the definition of embezzlement for purposes of section 523(a)(4)." *In re Wada*, 210 B.R. 572, 576 (B.A.P. 9th Cir. 1997). "Embezzlement is defined as 'the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come.'" *Id*. (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)).

"Embezzlement" within the meaning of section 523(a)(4) requires three elements: (1) property rightfully in the possession of the non-owner debtor; (2) the non-owner's misappropriation of the property to a use other than that for which it was entrusted; and (3) circumstances indicating fraud. *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991) (affirming decision of lower courts that plaintiff did not meet its burden of proof on embezzlement claim; bankruptcy court correctly held that debtors did not act with intent to defraud plaintiff). For purposes of embezzlement, a fiduciary relationship is not required. *Id*.

"Courts to consider the scienter requirement for an embezzlement claim consistently have ruled, or otherwise stated, that a claim of embezzlement requires a specific intent to defraud." *In re Razavi*, 539 B.R. 574, 600 (Bankr. N.D. Cal. 2015). "A wrongful appropriation of property under an erroneous belief of entitlement does not equate to the fraudulent intent necessary for embezzlement." *In re McVay,* 461 B.R. 735, 745 (Bankr. C.D. Ill. 2012).

"Fraudulent appropriation requires an intent to deprive, which can be inferred from the conduct of the person accused and from the circumstances of the situation." *Savonarola v. Beran*, 79 B.R. 493, 496 (Bankr. N.D. Fla. 1987). "Concealment of a misappropriation can be a circumstance indicating fraud." *In re Campbell*, 490 B.R. 390, 402 (Bankr. D. Ariz. 2013).

In *Campbell*, the bankruptcy court held that the debtor had a nondischargeable debt to the plaintiff for embezzlement under section 523(a)(4). The plaintiff had provided a $1 million initial capital contribution to a limited liability company (the "LLC"), for which the debtor was a co-manager.  The LLC was formed to develop a condominium project (the "Project").  Soon after the deposit of the plaintiff's capital contribution, which was to be used to finance the Project, the other co-manager of the LLC engaged in a series of self-dealing withdrawals.  Some of the funds went to short term loans designated for that co-manager.  Other funds went to his other business ventures, and a substantial payment went to an entity controlled by the debtor. Even after the debtor was aware of the co-manager's misappropriation of funds that were to be used for the Project, substantial amounts of money continued to be paid or transferred to the other co-manager and his entities.  Moreover, the debtor concealed this information from the plaintiff.

As stated by the court in *Campbell*, "[t]he evidence reflects a misappropriation of property, with the debtor's complicity, for a purpose other than which the funds were entrusted." Because the debtor did not disclose this misappropriation of the funds to the plaintiff, even after repeated requests, and the debtor disregarded the fraudulent behavior perpetrated on the LLC, the circumstances indicated fraud.  Consequently, the court held that the debtor was liable to the plaintiff for embezzlement of its initial capital contribution under section 523(a)(4).

### 2.    Larceny

In bankruptcy, federal common law defines larceny as the "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *In re Ormsby*, 591 F.3d 1199, 1205 (9th Cir. 2010). "The elements of larceny differ only [from the elements of embezzlement] in that a larcenous debtor has come into possession of funds wrongfully." *In re Mickens*, 312 B.R. 666, 680 (Bankr. N.D. Cal. 2004). A finding of larceny requires proof of the

debtor's fraudulent intent in taking the creditor's property. *In re Sokol*, 170 B.R. 556, 560 (Bankr. S.D.N.Y 1994). For purposes of larceny, a fiduciary relationship is not required. *In re Littleton*, 942 F.2d at 555.

### III.    ANALYSIS

**A.    11 U.S.C. § 523(a)(2)(A)**

#### 1.    Alleged Fraudulent Misrepresentations

Plaintiff contends that he "relied on [Defendant's] statements and the prior loan that was repaid in my decision to lend him $50,000.00 to finish his studio so he could take the work and make money." Kine Declaration, ¶ 13. However, Plaintiff has not met his burden of proof in showing that Defendant, with intent to defraud Plaintiff, made false representations in order to obtain the Funds.[11]

#### a.    Statements Concerning Central LLC's Value

Plaintiff alleges that Defendant misrepresented Central LLC's value to induce Plaintiff to give Defendant the Funds. In his declaration, Plaintiff states that "[p]rior to executing and funding the loan, [Defendant] Emailed [sic] me and had proven to me that…[Central LLC] held $600,000.00 in assets." *Id*. In addition, Plaintiff asserts that "during July, 2019[12]…John McKracken and [Plaintiff] went [to] Central [LLC] to view assets. It was during that visit that

---

[11] At trial, Plaintiff contended that Defendant, with intent to defraud Plaintiff, omitted certain information from their communications in order to obtain the Funds. According to Plaintiff, these omissions include that: (1) the air conditioning in Central LLC's warehouse was not working properly; (2) other investors in Central LLC had leveraged credit cards for their capital contributions; (3) Central LLC was behind approximately $10,000 on its rent; and (4) Central LLC was never in a position to buy back Plaintiff's investment. Plaintiff has not shown, by a preponderance of the evidence, that Defendant failed to provide Plaintiff with any of this information with fraudulent intent.

[12] At trial, Defendant credibly testified that Plaintiff did not visit Central LLC at the Property until September 10, 2019.

[Defendant] told [Plaintiff] with Mr. McKracken as a witness, [Central LLC] had ten (10) contracts and bookings worth approximately $500,000.00." *Id.*, ¶ 9.

Plaintiff has not produced any emails or other writings from Defendant to Plaintiff stating that Central LLC held $600,000 in assets. As concerns the alleged contracts or bookings worth $500,000, assuming Defendant did make these statements to Plaintiff, Plaintiff has not demonstrated that such statements were false or that Defendant made them with an intention to defraud Plaintiff.

In addition, it appears that Defendant was, at all relevant times, at least a 30% owner in Central LLC. *See* Plaintiff's Exhs. 10 and 15. The value of an asset in which Defendant owns a significant percentage has a direct relation to or impact on Defendant's overall financial status. *See Lamar, Archer & Cofrin, LLP*, 138 S.Ct. at 1761. Section 523(a)(2)(A) excludes such statements about a defendant's financial condition. Consequently, Plaintiff cannot recover for any alleged false representations concerning Central LLC's value under section 523(a)(2)(A); nondischargeability of Defendant's debt to Plaintiff, if any, based on misrepresentations concerning Central LLC's value must be established under 11 U.S.C. § 523(a)(2)(B).

> ### b.    Use of the Funds

In Plaintiff's declaration, he states that "[i]n early 2019 [Defendant] approached me for another loan and stated that he needed $50,000.00 to finish his standing set studio so he could complete the hospital and jail." *Id.*, ¶ 7. Plaintiff further asserts that:

> At some time during June, 2019, approximately a month before John McKracken and I visited the studio, [Defendant] told me he had the studio up and was working through the buildout, approximately 50,000 square feet at the Canoga Park studio and he was looking for an additional loan to finish studio.

*Id.*, ¶ 8.

To the extent that Plaintiff asserts Defendant intentionally misrepresented how the Funds would be used, Plaintiff has not met his burden of proof. Plaintiff has not demonstrated that Defendant's statements were false. Rather, considering the photographs emailed to Plaintiff on September 25, 2019, which appear to show progress of the build-out, and the photographs emailed to Plaintiff January 15, 2020, which appear to show completed sets, including hospital, exam room and morgue sets, Plaintiff has demonstrated that Central LLC's build-out was completed as the parties discussed.

In addition, Plaintiff has not established that, by using a portion of the Funds to pay Central LLC's rent to prevent it from being evicted before the build-out was completed, Defendant utilized the Funds for a purpose that departed from what the parties discussed or that Defendant intentionally mislead or intended to deceive Plaintiff about how the Funds would be used.

### c.    Payments to Plaintiff

In his declaration, Plaintiff states that "[Defendant] orally promised to pay me $2,500.00 per month, with payments starting November 15, 2019 and that I would receive 10% ownership of the studio." *Id*., ¶ 7. Plaintiff further states that he told Defendant "if [Plaintiff] was going to loan the money [Plaintiff] required a monthly payment $2,500.00 and the full amount was to be fully repaid within two years." *Id*., ¶ 8. According to Plaintiff, "[Defendant] said, 'fine,' and stated [Defendant] would draft a contract." *Id*.

The parties dispute whether the Funds constituted a loan from Plaintiff to Defendant or an investment in Central LLC. Defendant testified that he never considered the Funds to be a loan and, at all times, considered the Funds to be an investment in Central LLC. According to Defendant, Plaintiff transferred the Funds in exchange for a 10% ownership interest in Central

-23-

LLC, and Plaintiff would be paid the same way as the other investors. According to Plaintiff, the Funds constituted a loan to be repaid in increments of $2,500, beginning on November 15, 2019. *See id.*, ¶¶ 7-8; Plaintiff's Exh. 11, p. 4.

Plaintiff's version of the share purchase agreement does not support Plaintiff's contentions. First, Plaintiff's version of the contract does not provide a maturity date, an interest rate, or any ongoing repayment terms. Rather, it only provides that "profits with a base of $2,500" would be paid starting on November 15, 2019. Plaintiff's Exh. 11, p. 4. This supports Defendant's contention that the Funds were not a loan to be repaid, but rather an investment in Central LLC.

Moreover, Plaintiff has not shown that Defendant agreed to make payments to Plaintiff in the amount of $2,500 beginning on November 15, 2019. The alleged starting date to make a payment was written into Plaintiff's version of the contract and not initialed by Defendant. This supports Defendant's contention that Plaintiff altered the contract without Defendant's knowledge. Consequently, Plaintiff has not met his burden of showing that Defendant misrepresented any intention or made any misrepresentation about if or how Defendant would "repay" Plaintiff in exchange for Plaintiff's $50,000 investment in Central LLC.

### d.    Transfer of Shares in Central LLC

In Plaintiff's declaration, he states that "[o]n September 17, 2019, [Defendant]/[Central LLC]…and [Plaintiff]…executed an agreement whereby [Defendant] agreed to sell 10 A shares of his company known as [Central LLC] for $50,000.00." Kine Declaration, ¶ 17. Plaintiff further asserts that "[Defendant] never physically transferred the 10 A shares of common stock to [Plaintiff], never made a payment on the loan, nor was any ownership interest in [Central LLC]

ever transferred. [Plaintiff] never received any K1 corporate tax records for [Plaintiff's] 10%
ownership interest." *Id*., ¶ 21.

Defendant contends that the parties agreed Plaintiff would be purchasing a 10%
ownership interest in Central LLC. Plaintiff's Exh. 6, p. 3. In addition, Defendant represents that
"[t]he contract was the proof that 10% ownership interest was transferred….[Central LLC] is not
a publicly traded company." *Id*. Defendant also testified at trial that he told Plaintiff he would
sell Plaintiff 10% of his share in Central LLC for $50,000 and that Defendant had unanimous
consent of all of Central LLC's members when he sold his shares to Plaintiff.

Pursuant to both copies of the share purchase agreement entered into evidence, Defendant
agreed to sell, and Plaintiff agreed to purchase, "all the rights, title, interest, and property of
[Defendant] in [10 A shares of Central LLC] for an aggregate purchase price of $50,000."
Plaintiff's Exh. 11, pp. 1-2; Defendant's Exh. A, pp. 1-2. Also, pursuant to both copies of the
share purchase agreement, upon closing and Plaintiff's payment of the $50,000, Defendant
would "deliver to [Plaintiff] duly executed transfers of the [10 A shares]." Plaintiff's Exh. 11, p.
3; Defendant's Exh. A, p. 3.

Plaintiff has not shown that Defendant's representations regarding Plaintiff's acquisition
of an interest in Central LLC were false. Moreover, Plaintiff has not demonstrated that he was
damaged as a result of not receiving "delivery" of shares in Central LLC.  Because of
cancellations of bookings and the inability to film in the Property, as a result of the pandemic,
Central LLC failed as a business; moreover, Central LLC was evicted from the Property.
Plaintiff made no showing of any return having been provided to any of the investors in Central
LLC, with respect to their equity interest in Central LLC. Finally, Plaintiff has not proven that
Defendant had the requisite fraudulent intent.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### e.    Defendant's Experience in the Film Industry

In his declaration, Plaintiff stated that "[p]rior to executing and funding the loan, [Defendant] Emailed [sic] me and had proven to me that he had made over 400 movies, including but not limited to The Dark Knight Rises (2012) and provided a link to [Defendant's] IMDb profile (https://www.imdb.com/name/nm0515791/)." Kine Declaration, ¶ 13. To the extent that Plaintiff asserts Defendant intentionally misrepresented his experience in the film industry to induce Plaintiff to provide him with the Funds, Plaintiff has not met his burden of proof. First, Plaintiff has not established that Defendant said he "made" over 400 movies.

On January 15, 2020, Defendant sent an email to Plaintiff containing a hyperlink to Defendant's online IMDB profile. In the email, Defendant states, "I have site repped in over 400 film and television productions, over 100 commercials, dozens of print shoots, dozens of music videos and over 300 student films." Defendant's Exh. B. To the extent that Defendant's January 15, 2020 is the email Plaintiff references in paragraph 13 of his declaration, Plaintiff has not shown that Defendant's statements in the email were false.[13]

Moreover, given that the January 15, 2020 email was not sent to Plaintiff until well after the Funds were disbursed, Plaintiff could not have relied on its contents or the included hyperlink to Defendant's IMDB profile in determining whether he would provide Defendant with the Funds. Consequently, Plaintiff has not met his burden to obtain relief under 11 U.S.C. § 523(a)(2)(A).

### B.    11 U.S.C. § 523(a)(2)(B)

Plaintiff does not assert a claim under section 523(a)(2)(B), in particular, in either the Joint Pretrial Statement or the Trial Brief. Nevertheless, Plaintiff has not established that there

---

[13] At trial, Defendant credibly testified that anyone, not just Defendant, could contribute information to his IMBD profile.

was a writing made by Defendant respecting Defendant's financial condition or purporting to communicate Central LLC's value or the value of Central LLC's assets. To the extent that Plaintiff relied on any verbal statements concerning Central LLC's value or the value of its assets, in deciding to transfer the Funds to Defendant in exchange for a 10% interest in Central LLC, because such statements must be in writing to be actionable, Plaintiff has not met his burden under 11 U.S.C. § 523(a)(2)(B).

**C.    11 U.S.C. § 523(a)(4)**

**1.    Embezzlement**

Plaintiff has suggested that Defendant committed embezzlement by using monies in Central LLC's corporate bank account, including the Funds, for his own personal use. However, Plaintiff has not shown that Defendant misappropriated any of the Funds or any monies in Central LLC's corporate bank account in this manner.

Defendant credibly testified that the Funds and other monies invested in Central LLC were used to, among other things, complete Central LLC's build-out and to pay a portion of Central LLC's rent, in order for Central LLC to be able to complete its sets on the Property.

In addition, Plaintiff has not demonstrated that Defendant misappropriated the Funds. Plaintiff provided Defendant with the Funds to acquire a 10% interest in Central LLC and in order for Central LLC to be able to complete the film production facilities at the Property.  The Funds became Defendant's property, in exchange for selling a portion of his interest in Central LLC to Plaintiff.  Defendant deposited the funds into the corporate bank account of Central LLC. The Funds then were used for Central LLC's operations, i.e., to build-out Central LLC's warehouse and to complete sets at the Property or to pay a portion of rents to the lessor of the

Property, so Central LLC could, and did, complete this build-out.  Lastly, Plaintiff has not shown that Defendant acted with intent to defraud Plaintiff.

The Court finds that: (1) there was no embezzlement by Defendant in connection with Central LLC or the use of the Funds; and (2) Plaintiff has not met his burden to show that Plaintiff holds a claim which is nondischargeable, based on embezzlement, under 11 U.S.C. § 523(a)(4).

### 2.    Larceny

Plaintiff as not proven, by a preponderance of evidence, that Defendant committed larceny in connection with receiving the Funds from Plaintiff. The evidence demonstrates that Defendant came into possession of the Funds lawfully. Plaintiff did not offer sufficient, if any, evidence that Defendant obtained the Funds, which Plaintiff willingly transmitted to Defendant, wrongfully or with fraudulent intent.

### III. CONCLUSION

Before and long after after he received the Funds from Plaintiff, Defendant anticipated that Central LLC would be profitable, and Defendant used the Funds and other monies invested in Central LLC to promote Central LLC's ability to operate successfully in the Property. The Court finds credible Defendant's testimony that Central LLC failed as a result of the unforeseen COVID-19 pandemic. Conversely, much of Plaintiff's testimony was evasive, contradictory of both the Joint Pretrial Stipulation and the Kine Declaration and lacked support. Coupled with the lack of credibility of Plaintiff's testimony, the surrounding circumstances support the finding that Defendant did not intend to deceive or defraud Plaintiff.

Consequently, Plaintiff has not met his burden of proving that: (1) Defendant intentionally made misrepresentations, fraudulent omissions, or engaged in deceptive conduct in

connection with Plaintiff's transfer of the Funds; (2) Defendant intentionally made materially false statements, in writing, respecting Defendant's financial condition; (3) Defendant committed embezzlement; or (4) Defendant committed larceny.

For the reasons discussed above, the Court will rule in favor of Defendant.

# # #

Date: August 10, 2023

Victoria S. Kaufman
United States Bankruptcy Judge